UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:08-CR-331-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| CARLTON BRONTA MAY, | ) | |
| | ) | |
| Defendant. | ) | |

This case comes before the court on the motion by defendant Carlton Bronta May ("defendant") (D.E. 18) to suppress certain evidence found during a search of his trailer home ("subject premises") on 24 April 2008 pursuant to a state search warrant, as well as statements he made incident to the search. The government filed a response (D.E. 25) in opposition to the motion. The motion was referred to the undersigned Magistrate Judge for issuance of a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). On 15 January 2009, the undersigned held a hearing on the motion. For the reasons stated below, defendant's motion should be denied.

## PROCEDURAL BACKGROUND

On 6 November 2008, a five-count indictment (D.E. 6) was issued against defendant charging him in the respective counts, as follows: (1) conspiracy to distribute and possess 50 grams or more of cocaine base (*i.e.*, crack) beginning on or about January 2007 and continuing until on or about 24 April 2008 in violation of 21 U.S.C. § 841(a)(1); (2) distribution of 5 grams or more of crack on or about 22 April 2008 in violation of 21 U.S.C. § 841(a)(1); (3) possession with the intent to distribute 5 grams or more of crack on or about 24 April 2008 in violation of 21 U.S.C. § 841(a)(1); (4) possession of firearms (*i.e.*, two rifles and a revolver) by a convicted felon on 24 April 2008 in violation of 18 U.S.C. §§ 922(g)(1) and 924; and (5) possession of a firearm in furtherance of a drug

trafficking crime (as charged in count 3) on 24 April 2008 in violation of 18 U.S.C. § 924(c).
Defendant filed his motion to suppress on 8 December 2008.

At the suppression hearing, the government presented the testimony of Wilson County
Sheriff's Office narcotics investigator Brad Carter ("Carter") (Transcript of Hearing ("Tr.") (D.E.
32) 5:2-10) and former Wilson Police Department narcotics and firearm investigator and member
of the ATF task force Johnny Hendricks ("Hendricks") (*id.* 72:17-20). The government also
introduced four exhibits: (1) a photograph of the two rifles subject to the indictment (Gov.'s Hrg.
Ex. 1); (2) a photograph of the revolver subject to the indictment (Gov.'s Hrg. Ex. 2); (3) the search
warrant, the completed application form for it, a probable cause affidavit, and the inventory of items
seized (collectively Gov.'s Hrg. Ex. 3);[1] and (4) the Incident Summary by the Wilson County
Sheriff's Office Emergency Response Team setting out in detail the plan for service of the search
warrant on the subject premises (Gov.'s Hrg. Ex. 4).[2] (*See* Hrg. Ex. List (D.E. 30)). Defendant
presented the testimony of Bonita Applewhite, defendant's first cousin, who rented the subject
premises to defendant and who herself lives in a trailer on the same lot. (Tr. 86:14-87:5). Defendant
also introduced three exhibits: an aerial photograph or map of the subject premises and surrounding
properties (Def.'s Hrg. Ex. 1);[3] and two photographs of the outside of Applewhite's trailer which
show the subject premises in the background (Def.'s Hrg. Exs. 2 and 3).[4]

---

[1] The government had filed copies of these documents as Ex. A (D.E. 25-2) to its response to defendant's motion.

[2] The government had filed a copy of this document as Ex. B (D.E. 25-3) to its response to defendant's motion.

[3] Defendant had filed a copy of this document as Ex. C (D.E. 18-4) to his motion.

[4] Defendant had filed as Exs. A and B to his motion copies of the search warrant and the corresponding application form,
probable cause affidavit, and inventory (D.E. 18-2, -3). There are a number of differences between the version of these
documents and the counterparts submitted by the government, although none appear material. Because the government
offered its version of these documents as an exhibit at the hearing without objection, Carter identified the exhibit as
authentic, and defendant did not offer his version at the hearing, the court is treating the government's version as

2

## FACTUAL BACKGROUND

The Wilson County Sheriff's Office began an investigation of defendant in response to complaints received from people who lived near the subject premises and information obtained from persons arrested in other investigations. (Tr. 7:4-10). The subject premises was placed under surveillance. (Tr. 7:14-15). The activity witnessed included an apparent illicit drug purchase in February 2008 involving Tyrone Kenney ("Kenney"), a federal cooperating defendant. (Tr. 8:14-18; 14:1-15:21).

In April 2008, Carter made arrangements in cooperation with Hendricks, who was then with the Wilson Police Department and was also investigating defendant, for a controlled purchase of crack from defendant by Kenney. (Tr. 7:16-8:15). On Monday, 21 April 2008,[5] Kenney placed a phone call to defendant, made arrangements to purchase 14 grams of crack, proceeded to the subject premises, and completed the purchase. (Tr. 9:5-15; 10:10-17; 12:3-17; 14:1-6; 50:12-24). While in route to and departing from the subject premises, Kenney was under surveillance by Carter, Hendricks, and two other officers. (Tr. 10:3-9). Field tests and SBI laboratory tests confirmed that the substance Kenney purchased from defendant was crack. (Tr. 13:1-13).

---

authoritative for purposes of defendant's motion. (*See* Tr. 21:10-22:13). Aside from the fact that the pages in defendant's version appear to be out of order (*i.e.*, the first page of the inventory appears as D.E. 18-3 and the second page as D.E. 18-2 at 3), the defendant's version does not include a floor plan as the government's version does (*see* Gov.'s Hrg. Ex. 3 at 4), the return section is completed in the government's version but not the defendant's (*compare id.* at 1 *with* D.E. 18-2 at 1), and the signatures and signature blocks are not identical in the two versions (*compare* Gov.'s Hrg. Ex. 3 at 1, 2, 3, 6 *with* D.E. 18-2 at 1, 2, 3, 4). It thus appears that the two versions were made from different originals, although the typed language in both is the same.

[5] The count of the indictment apparently relating to this purchase, count two, states the offense date as "[o]n or about April 22, 2008." (Indict. at 1).

Subsequent to the controlled purchase, Carter prepared and on 23 April 2008 obtained issuance by a North Carolina magistrate of the search warrant at issue. (*E.g.*, Tr. 16:18-21; 43:23-44:1; Gov.'s Hrg. Ex. 3).[6] The warrant itself identified the premises to be searched as:

> 4740-A OLD STANTONSBURG ROAD
> (ADDRESS VERIFIED BY GIS COUNTY MAPPING)
> WILSON N.C. 27893

(Gov.'s Hrg. Ex. 3 at 1, Warrant). "GIS" refers to the Wilson County GIS Mapping System ("GIS system"). (Tr.16:18-17:4). The GIS system is a computer software program that provides detailed maps of the entire county along with other specific information for each property, including aerial photographs, addresses, property lines, and ownership information. (Tr. 16:18 to 19:1). Carter used the GIS system to determine the address for the subject premises because there was no visible house number on the subject premises themselves or on the mailbox in front of them. (Tr. 18:7-16).

The probable cause affidavit by Carter with the application form further described the subject premises as "a mobile home located up a gravel path off of Old Stantonsburg Road." (Gov.'s Hrg. Ex. 3 at 3, Prob. Cause Aff.; Tr. 43:23-44:1). It contained other descriptive information as well. (*Id.*). In addition to the described premises, the warrant authorized the search of defendant's person and the van defendant operates. (Gov.'s Hrg. Ex. 3 at 1, Warrant ("You are commanded to search the premises, vehicle, person, and other place or item described in the application . . . ."); *id.* at 2, Warrant Appl.).

---

[6] Carter's preparation of the warrant does not appear to be in dispute. Nevertheless, the court notes that the warrant, warrant application, and probable cause affidavit all identify Carter as the applicant, and his signature appears on the application and affidavit. (Gov.'s Hrg. Ex. 3 at 1, Warrant; *id.* at 2, Warrant Appl.; *id.* at 3, Warrant Appl.). Although the warrant identifies Detective Bass as an additional affiant (*id.* at 1, Warrant), there is no affidavit or other material bearing his name accompanying the warrant.

4

The application described the property to be seized as follows:

COCAINE, MARIJUANA, PARAPHERNAILA [sic] AND OTHER ITEMS THAT INDICATE THE POSESSIO[N] [sic] AND SELL [sic] OF CONTROLLED SUBSTANCES. ALSO ANY DOCUMENTS OR ITEMS SHOWING OWNERSHIP AND PROCEEDS FROM THE SALE OF CONTROLLED SUBSTANCES.

(Gov.'s Hrg. Ex. 3 at 2, Warrant Appl.).

On Wednesday, 23 April 2008, at the request of the investigating officers, Kenney placed another phone call to defendant and arranged to purchase two ounces of crack the following day, which was the day planned for execution of the search warrant. (Tr. 15:23-16:17). The purpose of this call was to ensure that there would be drugs at the subject premises when the warrant was executed. (Tr. 13:17-25).

On Thursday, 24 April 2008, Kenney called defendant to confirm the planned transaction. (Tr. 24:6-12). Although defendant stated that he had only an ounce and a half of crack, the decision was made to go ahead with execution of the warrant that day. (Tr. 24:17-21). The subject premises had been under surveillance since 8:00 that morning. (Tr. 24:22-25:3).

Subsequently, around 2:30 or 3:00 that afternoon, Carter, Hendricks, and another officer who had been involved in the investigation of defendant (*i.e.*, Detective Bass) led the Wilson County Sheriff's Office Emergency Response Team, a SWAT unit, to the subject premises. (Tr. 17:8-16; 27:13-18; 28:9-19; 29:1-5). The Emergency Response Team then entered the subject premises. (Tr. 28:17-19). As they did, defendant flushed two bags of crack down the toilet, but they were recovered by officers under the trailer who disconnected the plumbing. (Tr. 29:8-25; 30:1-3; 61:14-25).

5

While the officers conducted the search of the subject premises, Hendricks interviewed defendant in Carter's vehicle. (Tr. 72:6-16). In addition to finding the crack, officers found and seized two rifles in defendant's bedroom. (Tr. 30:10-18; 33:1-6; Gov.'s Hrg. Ex. 1). During his interview, defendant directed the officers to another firearm, a revolver, which was found in the kitchen of the subject premises. (Tr. 31:9-13; 32:19-33:6; 75:7-11; Gov.'s Hrg. Ex. 2). Officers also seized, among other things, drug packaging materials, digital scales, ammunition, $17,181.00 in cash, and a small quantity of crack. (Tr. 34:6-35:14; Gov.'s Hrg. Ex. 3 at 5, Inventory).

In the interview, defendant made additional incriminating statements, including admitting to flushing the crack down the toilet when the officers entered his home, having sold crack or powdered cocaine for eight to ten years, and having sold on average at least an ounce of crack each day since 1 January 2008. (Tr. 75:12-76:1). He also stated that he lived at the subject premises, which he rented, with his wife and stepdaughter. (Tr. 76:2-5).

## DISCUSSION

## I. THE FOURTH AMENDMENT STANDARD FOR SEARCH AND SEIZURE

Defendant moves to suppress all evidence obtained from the search of the subject premises, including the statements he made in the interview incident to the search, on the grounds that the evidence was obtained in violation of the Fourth Amendment to the United States Constitution. Although the warrant that defendant challenges in this federal criminal prosecution is a state one obtained and executed by local law enforcement officers, the validity of the warrant must be examined under federal standards. *United States v. Melancon*, 462 F.2d 82, 91-92 (5th Cir. 1972).

6

The Fourth Amendment provides that people are "to be secure in their persons . . . and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The exclusionary rule provides that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974). The rule applies to both the direct and indirect products of an unlawful search. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). Thus, evidence subject to the exclusionary rule includes not only "physical, tangible materials obtained either during or as a direct result of an unlawful invasion," but also any verbal evidence or statements resulting from the unlawful search. *Id.* at 485.

## II.   DEFENDANT'S ARGUMENTS FOR SUPPRESSION

Defendant advances two arguments for suppression of the evidence obtained from the search: the search warrant was invalid because it contained an erroneous description of the subject premises and, even if the search warrant was valid, the firearms seized were not within the scope of the warrant or otherwise subject to lawful seizure. The court will address in turn the validity of the warrant, the seizure of the firearms, and defendant's statements incident to the search.

### A.   Validity of the Search Warrant

The Fourth Amendment to the Constitution requires search warrants to particularly describe the place to be searched and the items to be seized. *Andresen v. Maryland*, 427 U.S. 463, 480 (1976). A warrant meets the particularity requirement "if the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503 (1925); *United States v. Owens*, 848 F.2d 462, 463 (4th Cir. 1988); *see also United States v. Moore*, 119 Fed. Appx. 438, 439 (4th Cir. 2004) (citing *Owens*). However,

7

"[a]n erroneous description in the warrant . . . does not necessarily invalidate a warrant and subsequent search." *Owens*, 848 F.2d at 463; *see United States v. Durk*, 149 F.3d 464, 465 (6th Cir. 1998) ("The test for determining whether a search warrant describes the premises to be searched with sufficient particularity 'is not whether the description is technically accurate in every detail' . . . ." (quoting *United States v. Prout*, 526 F.2d 380, 387 (5th Cir. 1976) (citations omitted)). "[L]imitations on the execution of search warrants should be examined in light of 'the need to allow some latitude for honest mistakes that are made by officers in [this] dangerous and difficult process.'" *Owens*, 848 F.2d at 463-64 (quoting *Maryland v. Garrison*, 480 U.S. 79, 87 (1987)). Moreover, where a portion of a warrant describes inaccurately the premises to be searched, but other portions describe the premises with sufficient particularity, a search pursuant to the warrant is generally upheld. *See United States v. Gitcho*, 601 F.2d 369, 371 (8th Cir. 1979). In determining whether the particularity requirement is met, courts look to the probability that the description in the warrant may result in the search of the wrong location. *Id.* at 465; *see Gitcho*, 601 F.2d at 371 ("The test for determining the sufficiency of the description of the place to be searched is whether the place to be searched is described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort, *and whether there is any reasonable probability that another premise might be mistakenly searched*." (emphasis added)).

"Evidence seized in violation of the particularity requirement is subject to suppression pursuant to the judicially created exclusionary rule." *Owens*, 848 F.2d at 463. However, in *United States v. Leon*, 468 U.S. 897 (1984), the United States Supreme Court created a good faith exception to the exclusionary rule. The Court held that evidence seized in violation of the particularity

8

requirement need not be suppressed where the officer executing the warrant acted in good faith with objectively reasonable reliance on a facially valid warrant. *Leon*, 468 U.S. at 922.

In this case, the court must first determine which materials accompanying the warrant the court may properly consider in determining the sufficiency and scope of the warrant. Defendant does not dispute that the application for the warrant and the probable cause affidavit were incorporated into the warrant itself, and the court finds that they were. Among other reasons, the warrant expressly authorizes search of "the premises, vehicle, person, and other place or item described in the application," and the application is described as being on the reverse side of the warrant. (Gov.'s Hrg. Ex. 3 at 1, Warrant). The probable cause affidavit was separately notarized by the magistrate and is labeled "Page 3 of 3," indicating the intent that it be considered with the warrant and application collectively as a single document. (*Id.* at 3, Prob. Cause Aff.). Therefore, the application and probable cause affidavit may be read together with the warrant to determine the validity and scope of the warrant. *See Moore v. United States*, 461 F.2d 1236, 1238 (D.C. Cir. 1972) (noting that while "[t]here is a fundamental distinction between the warrant and the underlying affidavit, and the affidavit is not necessarily either part of the warrant or available for defining the scope of the warrant," if appropriately incorporated by reference, the affidavit can be considered for purposes of determining whether the particularity requirement has been met).

Turning now to the content of the warrant materials (that is, the warrant, warrant application, and probable cause affidavit collectively), defendant contends that the street address of 4740-A listed in the warrant was incorrect. The court does not agree. It was the address provided by the GIS system for the subject premises, as previously discussed. Although Applewhite denied at the hearing that any trailer on her lot had the address 4740-A (Tr. 88:2-3), her testimony does not discredit the

9

evidence that Wilson County, as shown by the GIS system, ascribes this address to the subject premises.[7] She also testified that neither she nor defendant received mail at the lot (Tr. 88:4-8), suggesting that there was not then a postal address tied to this location. (*See* Tr. 18:11-16) (mailbox at front of property had no number)).

The court does believe, however, that the address of 4740-A, standing alone, is an inadequate identifier for the subject premises. Specifically, it is overbroad. The reason is that the other two trailers on the same lot—Applewhite's and a third trailer—also have that address.[8] (Tr. 69:13-20). Carter discovered that fact when using the GIS system to prepare the search warrant. The address 4740-A popped up for the two other trailers when Carter clicked on the aerial image of them just as it had when he clicked on the image of the subject premises. (Tr. 70:1-10).

The overbreadth of the 4740-A address does not itself, however, render the warrant invalid. Courts have repeatedly held that an incorrect address, including an incorrect house number, does not invalidate a warrant where there is some other reasonably specific description of the property. *See, e.g., Moore,* 119 Fed. Appx. at 439 (wrong street); *Durk,* 149 F.3d at 465 (wrong house number); *Gitcho,* 601 F.2d at 370 (wrong building number); *United States v. Shropshire*, 498 F.2d 137, 142 (5th Cir. 1974) ("second trailer" wrongfully identified as third trailer); *Hickman v. Marzec,* Civ. Action Nos. 05-811-GMS, *et al.*, 2008 WL 4279423, at *11 (D. Del. 18 Sept. 2008) (wrong city).

---

[7] The aerial photograph or map that Applewhite offered as Def.'s Hrg. Ex. 1 shows 4740 as the address of her trailer. (Tr. 89:12-15). The precise nature and source of this map are, however, unclear. Applewhite testified on direct that it came from the Wilson County mapping department (Tr. 87:9-13) and on cross-examination that it came from "the tax office" (Tr. 91:8-10). She did not herself obtain it through the GIS system. (Tr. 91:12-21). In any event, Applewhite did not state what she believed the address of the subject premises to be. Her testimony therefore did not establish that the subject premises had a unique address. Rather, her testimony is consistent with the subject premises having the same address as her home.

[8] Defendant's contention in his motion (Def.'s Mot. at 2 ¶ 5) that there are only two trailers on the lot is simply erroneous. (Tr. 65:14-66:19; Def.'s Hrg. Ex. 1).

Defendant also challenges as insufficiently specific the description in the probable cause affidavit of the subject premises as "a mobile home located up a gravel path off of Old Stantonsburg Road." (Gov.'s Hrg. Ex. 3 at 3). The court agrees, that standing alone, this description does lack the requisite particularity. All three trailers on the lot in question could reasonably be said to fit this description, as the aerial photograph submitted by defendant demonstrates and Carter essentially conceded. (*See* Def.'s Hrg. Ex. 1; Tr. 44:25-45:10).

There is, however, descriptive information in the warrant documents that does uniquely identify the subject premises. For example, the warrant specifically links defendant to the premises to be searched. Indeed, the caption on the warrant names defendant and then lists the address of the subject premises under his name. (Gov.'s Hrg. Ex. 3 at 1, Warrant). It reads:

In the Matter of

CARLTON BRONTA MAY

4740-A OLD STANTONSBURG ROAD
(ADDRESS VERIFIED BY GIS COUNTY MAPPING)
WILSON N.C. 27893

(*Id.*). The clear implication is that defendant lives at this location.

Moreover, the warrant authorizes the search of defendant's person, for illicit drugs and related evidence, and the application provides a detailed description of him, including his birth date, weight, height, tattoos, scars, and his vehicle. (Gov.'s Hrg. Ex. 3 at 1, Warrant; *id.* at 2, Warrant Appl.). The application reads in relevant part:

CARLTON BRONTA MAY (B/M) DATE OF BIRTH . . . [month and day omitted] 1975, APPROXIMATELY 6'03 AND 220 LBS. MAY HAS TATTOO ON HIS LEFT ARM "BO", "SMILE NOW CRY LATER", (2) FACES, ON HIS RIGHT ARM- CARDS, "HOLD MY OWN", PIT BULL. CARLTON BRONTA MAY OPERATES A BLACK IN COLOR GMC VAN WHICH DISPLAYS N.C. REGISTRATION PLATE MXC-1477

11

(Gov.'s Hrg. Ex. 3 at 2, Warrant Appl.). The warrant, of course, also authorizes search of defendant's vehicle and the application provides the detailed description of it set out above. (Gov.'s Hrg. Ex. 3 at 1, Warrant; *id.* at 2, Warrant Appl.). These portions of the warrant materials therefore also clearly contemplate that defendant occupied the subject premises.

Courts have held that a warrant which otherwise lacks an adequate description of the premises to be searched may still be valid where, as here, it specifies the name of the occupant of the premises. *See, e.g., Durk,* 149 F.3d at 466 (warrant held adequate despite errors in description of house to be searched where it included name of the tenant in the house); *United States v. DePugh,* 452 F.2d 915, 920 (10th Cir. 1971) (warrant held not fatally invalid due to an inaccurate description of the land where *inter alia* house was located because the warrant named the owner of house to be searched and gave location of house with reference to town and highway); *United States v. Hassell,* 427 F.2d 348, 349 (6th Cir. 1970) (warrant held adequate despite inaccuracies in description of farm to be searched where *inter alia* it included name of occupant of farm); *see also United States v. Bedford,* 519 F.2d 650, 655 (3d Cir. 1975) (warrant to search address at which there were two apartments held valid where *inter alia* the warrant specified the occupant of the apartment to be searched);[9] *Moore,* 461 F.2d at 1238 (same); *Kenney v. United States,* 157 F.2d 442, 442 (D.C. Cir. 1946) (same).

In addition, the probable cause affidavit uniquely identifies the target residence as one which has recently been under surveillance for illicit drug activity and at which a drug purchase occurred in the past two days. (Gov.'s Hrg. Ex. 3 at 3, Prob. Cause Aff.). The affidavit reads in relevant part:

---

[9] The presence of multiple apartments in the same building is analogous to the presence of multiple trailers on the lot at issue here because, for purposes of the Fourth Amendment, multiple apartments in the same building stand on the same footing as multiple houses. *Moore,* 461 F.2d at 1238.

12

In the past several days surveillance has been conducted on this residence and known drug offender(s) have been seen coming to and from the residence.

Over the past 48 hours detectives have made a purchase of illegal narcotics from this location by a confidential and reliable informant. The informant was observed going directly to and from the target location without making any stops. The informant and the vehicle were also checked before the purchase was made.

(*Id.*). These statements are consistent with the evidence previously reviewed regarding police actions directed toward the subject premises, including specifically the drug purchase by Kenney from defendant. At the same time, there is no evidence of any police activity directed to either of the other trailers on the lot. (*See* Tr. 62:18-23 (Carter disclaims any interest in the house nearby defendant's)).

The court finds that the foregoing information in the warrant materials associating defendant with the subject premises and summarizing the police activity directed at the subject premises described them with sufficient particularity to enable the executing officers to locate and identify them with reasonable effort as the premises to be searched. *See Owens*, 848 F.2d at 463; *Gitcho*, 601 F.2d at 371. The description of the subject premises that is provided is sufficient to preclude the type of general, exploratory search that the particularity requirement is designed to prevent. *See Owens*, 848 F.2d at 463 (citing *Andresen*, 427 U.S. at 480).

Moreover, there was no reasonable probability that either of the other two mobile homes would have been searched by mistake. *See Owens*, 848 F.2d at 465; *Gitcho*, 601 F.2d at 371. One reason, of course, is the unique descriptive information in the warrant materials that was just discussed. Moreover, Carter and Hendricks, who with another participant in the investigation of defendant (*i.e.*, Detective Bass) led the Emergency Response Team to the subject premises, were personally familiar with the premises and defendant through prior surveillance of these premises, including surveillance of the drug purchase by Kenney two days earlier. (*See* Tr. 10:3-9; 17:8-16; 27:6-12; 28:14-19). Carter was also personally familiar with defendant's van, having stopped it

13

previously and apparently having seen it during surveillance of the purchase by Kenney. (Tr. 11:24-12:2; 27:9-10). Moreover, surveillance on the day of the search revealed defendant to be at the residence. (Tr. 27:20-28:8). One of the officers conducting such surveillance (*i.e.*, Sergeant Moats) was also personally familiar with defendant from a prior arrest. (Tr. 28:2-5).

Courts have repeatedly recognized that the executing officers', as well as the requesting officers', surveillance of and resultant familiarity with the premises to be searched, like that here, is a factor supporting the validity of a warrant. *See, e.g.*, *United States v. Mann*, 389 F.3d 869, 876-77 (9th Cir. 2004) (upholding a search warrant which misstated address of a rural campsite where agents executing the warrant personally knew which premises were intended to be searched; also recognizing reference to a vehicle as means to identify premises); *Durk*, 149 F.3d at 467; *United States v. Hutchings*, 127 F.3d 1255, 1259 (10th Cir. 1997) (warrant for trailer on remote public lands upheld despite errors in description of trailer's location where warrant stated that executing officers had observed the trailer the previous evening); *Gitcho*, 601 F.2d at 372 (warrant for apartment held valid despite fact that an erroneous number was used for the apartment building and no such numbered building existed where *inter alia* executing officers personally knew which premises were intended to be searched); *Hickman*, 2008 WL 4279423, at *11 (in civil rights action against officers who executed search warrant, warrant held valid despite errors in description of trailer to be searched where *inter alia* officer who prepared warrant and helped execute it had conducted surveillance of the trailer). Courts have noted in particular surveillance of the premises while awaiting the arrival of the executing officers, which also occurred here, as negating the risk of error and supporting the warrant. *See, e.g., Durk*, 149 F.3d at 466; *Gitcho*, 601 F.2d at 372; *Hassell*, 427 F.2d at 349.

14

Consistent with these cases, Carter in fact relied on his familiarity with the subject premises from prior surveillance, the apparent presence of defendant's van at the premises, and defendant's presence there on the day of execution in directing the Emergency Response Team to the subject premises as the location to be searched. (Tr. 27:6-12; 62:7-17). Courts recognize the fact that the correct location was searched as further support for the validity of a warrant. *See, e.g., Mann,* 389 F.3d at 877; *Gitcho,* 601 F.2d at 372.

The thorough familiarity of Carter, as well as Hendricks, with the subject premises and defendant shows that the address for the subject premises and the description of it as "a mobile home located up a gravel path off of Old Stantonsburg Road" in the warrant materials were, in fact, immaterial to directing the executing officers to the correct location to be searched. The address information was obtained and the description of the location as up the gravel path was prepared to document what the officers already knew firsthand; this information did not serve as directions to unknowing officers as to where the premises to be searched were located. The imprecision in the address and the description of the premises as up the path therefore had no practical impact on whether the proper location would be searched. For these additional reasons, the court believes the warrant described the premises to be searched with sufficient particularity.

Nevertheless, even if the description of the subject premises were deemed insufficiently specific, the court would find that the officers who executed the warrant acted in good faith and had a reasonable belief that the warrant was sufficiently particular in its description of the target property. *See Leon,* 468 U.S. at 922. There is, of course, no question that additional information could have been included in the description to help further distinguish the subject premises from the other trailers on the lot, including its location relative to the other trailers, or the color of it and its roof (Tr.

15

11:1-3; 44:17-24). However, as discussed, the description of the subject premises in the warrant materials was for Carter simply an attempt to formally specify a location with which he, Hendricks, and at least one other officer were already familiar. Because neither they, nor thereby the other officers participating in execution of the warrant, needed the description in the warrant materials to locate the proper place to be searched, they could reasonably have considered the description given to be sufficiently specific. The fact that a magistrate issued the warrant based on the description provided is further justification for Carter's and the other officers' reliance on the description as sufficient.

In addition, Carter did attempt to acquire a unique identifier for the subject property in the form an address, and he turned to a seemingly valid source—the GIS system—to obtain it. He resorted to this source in the absence of any number on the subject premises or on the mailbox in front of them. (Tr. 18:7-16). To be sure, Carter knew before he obtained the warrant that the 4740-A address was not unique to the subject premises. However, the address is what it is; he could not manufacture a unique address himself. While the non-unique character of the address may arguably have called for relatively greater specificity in other portions of the description of the subject premises, Carter could have reasonably believed that the other information included provided the requisite level of particularity, again, against the backdrop of his firsthand knowledge of the subject premises and the magistrate's approval of the warrant. Similar considerations establish that Carter's use of the imprecise description of the subject premises as "a mobile home located up a gravel path off of Old Stantonsburg Road" was not in bad faith. The court therefore believes that the evidence obtained from the search would come within the *Leon* exception to the exclusionary rule.

16

**B.     Seizure of the Firearms**

Defendant next contends that, even assuming the warrant is valid, the firearms seized during the search should be suppressed because they did not fall within the scope of the search warrant and could not otherwise be lawfully seized. The search warrant here authorized seizure of "COCAINE, MARIJUANA, PARAPHERNAILA [sic] AND OTHER ITEMS THAT INDICATE THE POSSESSIO[N] AND SELL [sic] OF CONTROLLED SUBSTANCES . . . [AND] ANY DOCUMENTS OR ITEMS SHOWING OWNERSHIP AND PROCEEDS FROM THE SALE OF CONTROLLED SUBSTANCES." (Gov.'s Hrg. Ex. 3 at 2, Warrant Appl.; *see id.* at 1, Warrant (authorizing seizure of property described in warrant application)). Defendant asserts that because this language was specifically limited to drug-related items, seizure of the firearms was unlawful. The court disagrees.

As discussed above, the Fourth Amendment requires that search warrants describe with particularity not only the place to be searched, but also the items to be seized. *See Andresen*, 427 U.S. at 480. However, items that are not expressly named in a warrant may nevertheless be properly seized under certain exceptions to the warrant requirement. Here, the government asserts that the firearms seized from the subject property were properly seized under the plan view doctrine. For this exception to apply, the government must show that: (1) the seizing officers were lawfully present at the place from which the evidence was plainly viewed; (2) the officers had a lawful right of access to the object itself; and (3) the incriminating character of the evidence was immediately apparent. *United States v. Wells*, 98 F.3d 808, 809-10 (4th Cir. 1996).

With respect to the first and second requirements, the court has already concluded above that the search warrant was valid and, therefore, the officers conducting the search of the subject premises

17

were lawfully present and had a lawful right of access to the firearms. Specifically, the warrant entitled the officers to be in the bedroom of the subject premises and the rifles were found there uncovered, next to the bedroom doorway. (Tr. 30:10-18). The photograph introduced as Gov.'s Hrg. Ex. 1 shows the rifles as the officers found them. (Tr. 32:2-10).

The revolver was found in the kitchen based on defendant's statement to the interviewing officer. (Tr. 31:9-13; 32:19-33:6; 75:7-11). The photograph introduced as Gov.'s Hrg. Ex. 2 depicts where the revolver was found, lying on a shelf under a bag resembling a briefcase. (Tr. 32:19-33:6). Although the officers did not discover the revolver on their own, it was located in an area that was subject to lawful search under the warrant and that search would have brought the revolver into plain view. *See Wells,* 98 F.3d at 810 (holding that the second requirement of the plain view doctrine was met where the subject weapon was in a place where items that were described in the warrant reasonably could have been found in plain view in the course of the search); *see also Maryland v. Garrison,* 480 U.S. 79, 84 (1987) ("[T]he scope of a lawful search is 'defined by the object of the search and the places in which there is probable cause to believe that it may be found.'") (quoting *United States v. Ross,* 456 U.S. 798, 824 (1982)).

Defendant contends that the third requirement of the plain view exception is not met because the firearms are not evidence of a crime. Again, the court disagrees. The firearms are evidence of possession of firearms by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).[10] Because the officers conducting the search knew defendant to be a convicted felon (Tr. 30:10-24), the presence of the firearms in his home constituted immediately apparent evidence of the crime of possession of firearm by a felon. *See Wells,* 98 F.3d at 810. In *Wells,* the Fourth Circuit expressly held that the

---

[10] The court notes that firearm possession by a felon is also prohibited by North Carolina law. *See* N.C. Gen. Stat. § 14-415.1.

incriminating nature of a firearm found during a search for evidence of federal bank fraud offenses was immediately apparent to agents conducting the search because they had knowledge of the defendant's previous felony conviction. *Id.* at 810; *see also United States v. Williams*, 289 Fed. Appx. 868, 871 (6th Cir. 2008) (holding that seizure of a firearm found in a night stand drawer during a lawful search of defendant's home for drugs was lawful where the officers knew from previous dealings with defendant that he was a felon); *United States v. Campbell*, 256 F.3d 381, 389 (6th Cir. 2001) (holding that a warrant to search defendant's home for all firearms was supported by probable cause because officers were aware of defendant's prior felony convictions and because "possession of any weapon would potentially be illegal" under both state and federal law).

Defendant argued at the hearing that the fact that the officers did not know whether defendant's rights to carry a firearm had been restored (Tr. 42:11-43:8) precluded seizure of the firearms for possession by a felon. However, knowledge that defendant had a prior felony conviction, combined with discovery of the firearms in his residence, was more than sufficient to establish probable cause to believe that defendant's possession was unlawful. *See United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (noting that while probable cause requires more than "bare suspicion," it requires less than evidence necessary to convict).

Nevertheless, even were the court to conclude that the firearms were not subject to seizure as evidence of the crime of possession of a firearm by a felon, they were clearly subject to seizure as evidence of drug crimes, including possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). The Fourth Circuit has expressly held that "[g]uns are tools of the drug trade and are commonly recognized articles of narcotics paraphernalia." *United States v. Ward*, 171 F.3d 188, 195 (4th Cir. 1999); *see also United States v. Collazo*, 732 F.2d 1200, 1206 (4th Cir.1984) (holding that the "admission of handguns into evidence in drug cases has been

19

consistently upheld as relevant to the issues raised by such cases"). Further, although the *Wells* case dealt with the seizure of a firearm during a search for evidence of bank fraud, the Fourth Circuit explicitly recognized that "[i]f a firearm is seized as evidence that it was used or carried during or in relation to a crime of violence or a drug trafficking crime, the incriminating nature of the object presumably would be immediately apparent based on the evidence of the underlying violent or drug-trafficking crime without knowledge that the possessor is a convicted felon." *Wells*, 98 F.3d at 810 n.1.

Each of the requirements of the plain view doctrine are therefore satisfied. The court concludes that the firearms at issue, although not mentioned in the warrant, were lawfully seized pursuant to the plain view doctrine.

## C. Defendant's Statements Incident to the Search

As indicated, defendant contends that the statements he made during the interview incident to the search as subject to exclusion on the grounds that the warrant and search were unlawful and the statements are fruit of the unlawful search. *See Wong Sun*, 371 U.S. at 485. Because the court has concluded that the search was pursuant to a valid warrant and otherwise lawful, defendant's challenge to the lawfulness of his statements fails. *See United States v. Sanderson*, 23 Fed.Appx. 150, 151 (4th Cir. 2001) (holding that the court's determination that the search of defendant's home was pursuant to a valid search warrant "forecloses the possibility that [defendant's] post-arrest statements could be considered the 'fruit of the poisonous tree.'").

## CONCLUSION

For the foregoing reasons, it is RECOMMENDED that defendant's motion to suppress be DENIED.

20

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten business days in which to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

IT IS FURTHER ORDERED that the arraignment in this case is continued to the April 2009 term. Any delay that results from this continuance shall be excluded from the Speedy Trial Act computation pursuant to 18 U.S.C. § 3161(h)(7)(A) on the grounds that the ends of justice served by granting this continuance outweigh the interests of the public and the defendant in a speedy trial.

SO ORDERED, this the 20th day of February, 2009.

James E. Gates
United States Magistrate Judge